**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| LUTHER MILLS, | : | CIVIL ACTION NO. 08-472 (MLC) |
|  | : |  |
|     Petitioner, | : | **MEMORANDUM OPINION** |
|  | : |  |
|     v. | : |  |
|  | : |  |
| UNITED STATES OF AMERICA, | : |  |
|  | : |  |
|     Respondent. | : |  |

**COOPER, District Judge**

Luther Mills ("Petitioner") moves to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. The underlying criminal case in this Court was United States v. Luther Mills, Crim. No. 07-280 (MLC). For the reasons set forth herein, issued without oral argument pursuant to Federal Rule of Civil Procedure 78, the Court will deny the motion.[1]

---

[1] The records filed herein are the following numbered docket entries ("dkt."): Original § 2255 motion (dkt. 1-1) [with exhibits from the underlying criminal case (dkt. 1-2): Ex. A, Criminal Complaint; Ex. B, Attachment A to Criminal Complaint (search warrant affidavit); Ex. C, Search Warrant; Ex. D, Search Warrant Inventory (dkt. 1-2); Ex. E, plea agreement; Ex. F, Information filed 4-3-07 ("Information"); Ex. G, 6-26-07 letter from Michael Chazen, Esq. to U.S. Probation; Ex. H, Judgment of Conviction; Ex. I, 12-12-07 Bureau of Prisons designation letter]; Miller notice (dkt. 2); Answer (dkt. 7-1) [with exhibits (dkt. 7-2): Ex. A, 10-5-06 Petitioner's post-arrest statement; Ex. B, Plea Agreement; Ex. C, transcript of plea hearing; Ex. D, transcript of sentencing hearing, Ex. E, Application for Permission to Enter Plea of Guilty; Ex. F, 4-30-08 letter from Michael Chazen, Esq. to Asst. U.S. Attorney]; and Petitioner's Reply Brief (dkt. 10). The Chambers file in the underlying criminal case also contains the 6-27-07 Presentence Investigation Report ("PSR"); a 10-19-07 letter sentencing brief from the government; and two letter sentencing briefs from defense counsel Michael Chazen, Esq., dated 10-19-07 [with numerous supporting letters], and 10-23-07.

## I.   **BACKGROUND**

Petitioner entered a plea of guilty on April 3, 2007, to a one-count Information charging that from in or about January, 2004, to in or about September, 2006, he did embezzle, steal, purloin, and knowingly convert to his own use and the use of another, Food Stamp benefits funded by the U.S. Dept. of Agriculture valued at more than $1,000, in violation of 18 U.S.C. §§ 641 and 2.[2]  He entered the guilty plea based upon a written plea agreement that contained stipulations relating to sentencing, as well as specified waivers of the right to appeal and collaterally attack the sentence.  (Dkt. 1-2, Ex. E, at 1-7.)

Petitioner was sentenced on October 25, 2007, pursuant to 18 U.S.C. § 3553(a), with the Federal Sentencing Guidelines being used as advisory only pursuant to United States v. Booker, 543 U.S. 220 (2005).  This Court followed the three-step sentencing

---

[2]  The offense statute provides in pertinent part:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, convey or disposes of any record, voucher, money or thing of value of the United States or of any department or agency thereof, ...;
... --
Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.
The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

18 U.S.C. § 641.

process summarized in <u>United States v. Gunter</u>, 462 F.3d 237, 247 (3d Cir. 2006), making the guidelines calculation, formally ruling on any motions for departure [there were none], and then exercising its discretion by considering the relevant Section 3553(a) factors.

This Court ruled that the guideline range for imprisonment was 24 to 30 months, based upon total offense level 17 and criminal history category I.  (Dkt. 7-2, Ex. D, at 4-6.)  The basis of the guidelines rulings is described below.  The sentence imposed was 24 months imprisonment, 3 years of supervised release with specified conditions, no fine, and a restitution amount of $391,395, with interest waived.  (<u>Id.</u> at 24-27.)  Petitioner having been compliant with bail conditions during the case, and based on counsel's request for a delayed reporting date (to which the government did not object), the Court authorized voluntary surrender on or after February 4, 2008.  (<u>Id.</u> at 27-28.)  The Judgment of Conviction was entered on November 1, 2007.  (Dkt. 1-2, Ex. H, at 1-5.)  Petitioner did not appeal.  The Bureau of Prisons notified him to report to the designated facility on February 4, 2008.  (Dkt. 1-2, Ex. I.)

Petitioner was represented by retained counsel Michael Chazen, Esq. in the underlying criminal case.  (<u>Id.</u> at 1.)  On December 6, 2007, Petitioner and his currently-retained counsel, Jonathan J. Sobel, Esq., met with the prosecutor to review certain documents.  (Dkt. 1-1 at 15, ¶ 71.)

This motion under 28 U.S.C. § 2255 ("Petition") was filed on January 28, 2008. (Dkt. 1-1.) It was timely under the one-year limitation period of § 2255, the Judgment of Conviction having been filed on November 1, 2007, and no appeal or motion to extend the time to appeal having been filed. See Kapral v. United States, 166 F.3d 565, 577 (3d Cir. 1999) ("If a defendant does not pursue a timely direct appeal to the court of appeals, his or her conviction and sentence become final, and the statute of limitations begins to run, on the date on which the time for filing such an appeal expired.").[3] The government filed an Answer with supporting documentation, and Petitioner filed a Reply Brief. See n.1 supra. We have extended his reporting date to adjudicate this Petition, denying a government motion objecting to continued release on bail in the underlying criminal case.

_____

[3]   The Judgment of Conviction was entered on November 1, 2007. (Dkt. 1-2, Ex. H.) Petitioner had 10 days after entry of that judgment to file a notice of appeal. See Fed.R.App.P. 4(b)(1)(A)(I). His 10-day period for filing a direct appeal expired on Monday, November 12. See Fed.R.App.P. 26(a)(1)-(2) (in computing time, exclude the day of the event, and exclude intermediate Saturdays, Sundays, and legal holidays when the period is less than 11 days). However, it appears that when he retained his current counsel, he still had time to request from this Court a 30-day extension of that appeal deadline, on grounds of excusable neglect or good cause. See Fed.R.App.P. 4-4(b)(4) (motion for extension of time). Petitioner did not seek such an extension of time to file a direct appeal, even though he had retained new counsel no later than December 6, 2007. (See dkt. 1-1 at 15, ¶ 71.) Instead, after the possible 30-day appeal extension time elapsed on or about December 11, 2007, Petitioner filed the pending § 2255 motion on January 28, 2008. (Dkt. 1-1.)

4

Petitioner alleges various claims of ineffective assistance by prior counsel, and a <u>Brady</u> violation by the government. He seeks an evidentiary hearing and leave to withdraw his guilty plea or an order vacating the sentence and granting a new sentencing hearing. (Dkt. 1-1 at 21). Upon review of the motion papers and the relevant materials contained in the record of the underlying criminal matter, this Court finds that an evidentiary hearing is not required. <u>See</u> Rules Governing Section 2255 Proceedings for U.S. District Courts, Rule 8(a); <u>United States v. McCoy</u>, 410 F.3d 124, 131-35 (3d Cir. 2005). We conclude that the Petition should be denied, for the reasons stated here.

## II.  DISCUSSION

### A.  Statutory framework

Under 28 U.S.C. § 2255:

> A prisoner in custody under sentence of a [federal]
> court . . . claiming the right to be released upon the
> ground that the sentence was imposed in violation of
> the Constitution or laws of the United States, or that
> the court was without jurisdiction to impose such
> sentence, or that the sentence was in excess of the
> maximum authorized by law, or is otherwise subject to
> collateral attack, may move the court which imposed the
> sentence to vacate, set aside or correct the sentence.

This Court has jurisdiction under 28 U.S.C. § 1331.

We first address burden of proof. Petitioner waived his right to jury trial in entering his guilty plea. He also waived his right to appeal and file a collateral attack of the sentence he received, as described below. We will apply the rule concerning burden of proof announced in <u>United States v. Mabry</u>,

536 F.3d 231 (3d Cir. 2008), a case addressing waivers of rights

of appeal and collateral attack in the context of a § 2255

petition.  There the court explained the standard as follows:

> Whereas a defendant bears the burden of presenting an
> argument that would render his waiver unknowing or
> involuntary, a court has an affirmative duty both to
> examine the knowing and voluntary nature of the waiver
> and to assure itself that its enforcement works no
> miscarriage of justice, based on the record before
> it....  [A] district court should carefully examine
> both whether the waiver was knowing and voluntary and
> whether it results in a miscarriage of justice....  [A]
> district court has an independent obligation to conduct
> an evaluation of the validity of a collateral waiver.
> Compliance with this obligation aids our review and
> ensures that the defendant's rights are carefully
> considered.

Id. at 237-38 (citing United States v. Khattak, 273 F.3d 557, 563

(3d Cir. 2001)).

### B.  Summary of Petitioner's claims

This Court at sentencing determined that Petitioner's

guideline offense level was 17, which produced an advisory

guideline range for imprisonment of 24-30 months in criminal

history category I.  (Dkt. 7-2, Ex. D, at 4-6.)[4]  Defense

counsel did not object to those calculations or move for

departure or variance.  (Id. at 4-6, 20-23.)  We sentenced

Petitioner to the bottom of that range, 24 months, acknowledging

---

[4]  The guidelines offense level calculation was base offense
level 6 (USSG § 2B1.1), plus 14 points for loss in the range of
$400,000 to $1,000,000 (§ 2B1.1(b)(1)(H))), minus 3 points for
acceptance of responsibility (§§ 3E1.1(a)-(b)), for a total
offense level of 17, using the Nov. 1, 2006 edition of the
Guidelines Manual.  (Dkt. 7-2, Ex. D, at 4-6.)

the statutory authority to sentence below the guideline range under 18 U.S.C. § 3553(a), but finding a sentence within the guideline range to be reasonable and appropriate.  (Id. at 24-26.)

Defense counsel, at the sentencing hearing and in his sentencing briefs, did strenuously and successfully argue for a markedly lower restitution figure than the $978,488.87 advocated by the government and recommended in the PSR.  (Id. at 6-17, 21-23.)  This Court imposed a restitution obligation of $391,395.00, over the government's objection and in accord with defense counsel's argument.  (Id. at 17-20, 26.)

Petitioner here seeks to challenge the loss calculation the Court used to determine his offense level, which was in the range of $400,000 to $1 million.  See n.4, supra.  Petitioner admitted in his guilty plea colloquy that the nature of his offense conduct was Food Stamp fraud that he committed by allowing individuals to obtain cash instead of food from his Food Stamp program-authorized deli, using their Food Stamp electronic benefit cards ("EBTs").  (Dkt. 7-2, Ex. C, at 28-29.)

The loss figure adopted by the Court in determining Petitioner's offense level ("loss amount") was based upon estimates provided by the government, and reviewed and recommended by U.S. Probation in the PSR.  In general, that loss figure was based upon a comparison of federal Food Stamp program records showing the total amount of Food Stamp transactions conducted by Petitioner's deli during a stated period of time,

7

and deducting from that total any expenditures shown in Petitioner's bank account records that could be attributable to buying food products to sell to his customers.  The government maintained, and Probation agreed, that based on a review of the available financial records of the parties, that was a reasonable approach to estimating the loss.  See USSG § 2B1.1, cmt. n.3(C) ("court need only make a reasonable estimate of the loss").  We describe the calculation of that loss amount in detail below.

Petitioner contends that defense counsel's performance was constitutionally deficient, and prejudicial to him, since counsel did not:  (1) obtain and review certain receipts and invoices seized from the deli in the search warrant execution that "would have buttressed [Petitioner's] claims that he spent significant sums of money for which he was not credited," so as to reduce the loss amount; and (2) "obtain an expert in the industry to testify as to what would have been reasonable expenditures for food," as another basis to reduce the loss amount.  (Dkt. 1-1 at 9, ¶ 41.) He asserts that "if the guilty plea is permitted to be withdrawn and/or the court allows Mr. Mills to be resentenced based upon this 'new' information, current counsel would be seeking to obtain an expert in the field as to the standard practices as well as seeking credit for the receipts and other invoices that have been ignored, to date."  (Id. at 19 n.10.)

The plea agreement reserved Petitioner's right to argue at sentencing that the loss amount was in the $200,000 to $400,000

8

range.  (Dkt. 1-2, Ex. E, at 6, ¶ 3.)  If Petitioner had so argued

and prevailed at sentencing, his loss amount adjustment would

have been 12 rather than 14, and his total offense level would

have been reduced two points, to level 15.  This calculation was

also described in the plea agreement stipulations, and both level

15 and level 17 were "collectively" stipulated to be the "agreed

total Guidelines offense level."   (Id. at 7, ¶ 6.)[5] But the

parties further stipulated in the plea agreement that "a sentence

within the Guidelines range that results from the agreed total

Guidelines offense level of 15 or 17 is reasonable."  (Id. at 7,

¶ 7.)  They further agreed that neither party would "seek or

argue for any upward or downward departure or any upward or

downward adjustment not set forth herein."  (Id.)

    The plea agreement also provided a waiver of appeal and

collateral attack rights.  There, Petitioner stipulated that if

the Court found his total offense level to be the "agreed total

Guidelines offense level of 17," and sentenced him within the

resulting guideline range, he would not appeal or otherwise

attack his sentence as to that calculation.  (Id. at 7, ¶ 8.)[6]

---

[5] A total offense level of 15, in criminal history category
I, would produce an advisory imprisonment range of 18-24 months,
rather than the range of 24-30 months determined at Petitioner's
sentencing based on the total offense level of 17.

[6] The waiver of appeal/collateral attack rights in
Petitioner's plea agreement did expressly exclude criminal
history computation.  (Dkt. 1-2, Ex. E, at 7 ¶ 8 ("The parties
reserve any right they may have ... to appeal the sentencing
court's determination of the criminal history category.").)  At

Here we quote verbatim the claims of ineffective assistance of counsel set forth in the Petition:

83. The following errors are assigned to counsel, Michael Chazen, Esquire in his representation of Luther Paul Mills:

   a. counsel for Mills failed to obtain and review a copy of the search warrant and the items listed in the return of the search warrant, otherwise, had he done so, he would have realized numerous documents existed to reduce the loss amount which has become the issue in this case;

   b. counsel importuned Mills' [sic] to plead guilty without this specific information regarding the loss amount and without adequately investigating the discovery which was available to review prior to the entry of the guilty plea.

   c. failing to advise Mills of the existence of such evidence and Mills' right to review said evidence well in advance of the guilty plea hearing.

   d. initially agreeing to a bottom line figure of $200,000.000 as it represented a loss amount to the government and later failing to challenge the loss amount of $400,000.00.

   e. counsel failed to retain an expert, an accountant, etc., who could have likely testified as to industry standards as to what the practice would be in terms of paying your vendors, in cash or otherwise and documenting proof of same.

   f. at the time of sentencing, counsel presented no argument that the loss amount should be less than a minimum of $400,000.00.  (Transcript, Oct. 25, 2007, at 4:9-25.).  This would have resulted in at least a two (2) point deviation from the total offense level.

   g. counsel for Mills did not file a Motion for Downward Departure.

_____

sentencing it was undisputed that he had no prior convictions and was in criminal history category I.  (Dkt. 7-2, Ex. D, at 5-6.)

    h.   Counsel did not file a Motion for
reconsideration of the Sentence imposed ....,
despite being requested to do so and did not
file a Notice of Appeal following the entry of
the judgment of conviction.

....

85.   Clearly, the poor performance of Mr. Chazen and his
failure to properly investigate the case and put
it into the proper posture for a cogent argument
at sentencing affected the sentencing, at the very
least by two (2) points which would have made Mr.
Mills at a fifteen (15) total offense level.

86.   More likely, the evidence which was not considered
by Chazen, the Assistant United States Attorney
and Court coupled with expert testimony would
could [sic] have further reduced the total offense
level either resulting in a non-custodial sentence
or quite possibly, a trial on the merits if the
down side was not such a significant exposure.

(Dkt. 1-1 at 18-19 (footnotes omitted).) Petitioner further
contends that the government's failure to disclose those items
("the search warrant receipts") to defense counsel during plea
negotiations or in the sentencing process constituted a violation
of his constitutional due process rights under <u>Brady v. Maryland</u>,
373 U.S. 83 (1963). (Dkt. 10 at 8-9.)

It is undisputed that Petitioner was, before and during the
period described in the Information, the owner of M & M
Delicatessen ("the deli"), located in Trenton, New Jersey. The
deli had been authorized to participate in the federal Food Stamp
program in or about September, 2000, and defendant completed the
application for that authorization as the deli owner. Under the
federal Food Stamp program, food stamp benefits were to be
redeemed only for the purchase of food items at the deli. (Dkt.
7-2, Ex. C, at 28-29; dkt. 1-2, Ex. B, at 2-4.)

Petitioner was arrested in this matter on October 5, 2006. He had previously received two official civil warning letters from the U.S. Department of Agriculture ("USDA"), Food and Nutrition Service ("FNS") for violations of Food Stamp regulations.  (Dkt. 1-2, Ex. B, at 4-5.)  The FNS requested a criminal investigation in June, 2004.  The ensuing investigation resulted in an affidavit in support of an arrest warrant against Petitioner and a search warrant for the deli.  (Affidavit, dkt. 1-2, Ex. B, at 3-10; Search Warrant, dkt. 1-2, Ex. C.)

When Petitioner was arrested on October 5, 2007, he provided a voluntary written statement under oath to a Special Agent of USDA, Office of Inspector General, stating verbatim as follows:

> My full name is Luther Paul Mills.  I reside at [redacted].  I am employed as the owner of M & M Deli located at [address].  I became the owner of M & M between 1998 & 2000.  My father, Winston D. Mills Sr. was the owner of M & M.  My brother, Winston D. Mills Jr. also works at the store.  When I became owner of M & M I attended the class given by the Food & Nutrition Service (F.N.S.) showing me the rules & regulations of the food stamp program.  I am aware of all the food stamp regulations.  My brother Winston D. Mills Jr. also knows the rules and regulations of the food stamp program.  My brother began exchanging EBT benefits (food stamps) for cash about 4 years ago with customers. I began exchanging EBT benefits for cash about 2 years ago with customers.  For example if a customer gave us $100 in EBT benefits we would give $60 in cash in return.  From June 2005 to May 2006 I would average about $56,000 in monthly EBT redemptions.  I would say that from the $56,000 in EBT, about $15,000-$16,000 would be legitimate EBT transactions.  About $40,000 would be from exchanging EBT benefits for cash.  I know that exchanging EBT benefits for cash is illegal.  Since

12

I have been the owner of M & M the most I do in monthly
legitimate EBT redemptions is about $15,000-$16,000.

(Dkt. 7-2, Ex. A, at 1-2.)[7]

The search warrant was executed at the deli on the same day,
October 5, 2007.  (Search Warrant, Dkt. 1-2, Ex. C; Search
Warrant Inventory, dkt. 1-2, Ex. D.)  The inventory of items
seized ("Inventory") was signed by Petitioner's brother and co-
worker, Winston D. Mills, Jr.  (Id.)  The items listed in the
Inventory are quoted in the margin.[8]  Petitioner contends that in

---

[7] We observe that this was a sworn confession by Petitioner
to Food Stamp fraud in amounts greatly exceeding the $1,000
statutory amount for a felony violation of 18 U.S.C. § 641.
Petitioner has not challenged this confession, either in the
underlying criminal case or in this § 2255 motion.

[8] The handwritten Search Warrant Inventory lists the
following seized items:

1.  Mossberg Shotgun [ser. no.] taken from 2nd floor
betw. desk & wall & 4 shotgun shells.

2.  12 NJ EBT cards, 1 NY EBT card, 2 misc. ids behind
plexiglass, 3rd shelf to left of register.

3.  EBT machine & pinpad behind plexiglass to left of
register.

4.  EBT receipts surrounding terminal.  One bag.

5.  (4) bags of EBT receipts behind register on floor
(2 white, 2 black).

6.  Lined sheets of nightly cash in register [and]
behind register on waist level shelf (per Winston
[illeg] also misc. receipts.

7.  Prescription drugs 2nd floor left side of desk 2nd
drawer.

8.  USDA records - top right side desk drawer.

9.  Invoices behind desk on top shelf near right wall,
if facing desk (several manila folders).

10.  Panther stungun & 2 boxes.

(Dkt. 1-2, Ex. D.)

13

making its loss calculation for sentencing purposes, "the government admittedly failed to review any of the invoices, receipts, etc., which were seized by the agents in their raid of Mills' business." (Dkt. 1-1 at 8, ¶ 39.)  He also contends, which we accept as true for purposes of this analysis, that neither he nor his defense counsel had the search warrant receipts to review prior to entering into the plea agreement or for purposes of sentencing.  (Id. at 15, ¶¶ 70-72.)

Petitioner and his current counsel met with the government post-sentencing, on December 6, 2007, and reviewed the search warrant receipts.  (Id. at 15, ¶ 71.)  Petitioner does not state when or how he became aware of those items.  However, he does not dispute that they were his own documents from the deli, signed for by his brother who was managing the store during the search warrant execution.  Nor was Petitioner detained upon arrest; release on bail was granted immediately.  The Petition does not further describe what the search warrant receipts were, or what if anything they reveal in relation to the loss amount issue he raises here.

C. **Summary of Respondent's contentions**

The Information to which Petitioner pled guilty covered the time period between approximately January, 2004 through September, 2006.  (Dkt. 1-2, Ex. F.)  The plea agreement gave Petitioner protection from further prosecution covering the

entire period from about 2001 to the date of the agreement. (Id., Ex. E, at 1.)  The government did not seek to include any losses from the pre-Information period as relevant conduct in the sentencing process.  Rather, the government confined its recommended loss estimate to the period of the Information, cutting off the calculation after the first quarter of 2006.

The government estimated the loss amount by using the USDA-documented food stamp redemption figures for the deli for that period ("EBT redemptions"), and reducing those figures by all amounts shown in the deli's bank checking account records that could reasonably be considered expenditures for food to be sold at the deli ("food expenditures").  In making that calculation, the government assumed (favorably to Petitioner) that the total food expenditures by check were for food stamp-eligible food commodities, and all of those food commodities were sold to food stamp recipients (making no distinction for customers not presenting food stamps).  (Dkt. 7-1 at 20.)

The following estimated loss was obtained by that method:

| Year | EBT Redemptions | Food Expenditures |
|------|-----------------|-------------------|
| 2004 | $217,996.08 | $15,483.27 |
| 2005 | $582,318.82 | $30,550.06 |
| 2006 (Jan.-Apr.) | $224,207.42 | $0 |
| TOTAL | $1,024,522.30 | $46,033.33 |

NET ESTIMATED LOSS:  $978,488.87

15

This figure was the basis of the loss estimate included in the PSR that was accepted by the Court at sentencing, resulting in a loss range between $400,000 and $1,000,000 on the loss table. See n.4, supra and accompanying text.

The government points out that defense counsel did make efforts before sentencing to reduce the loss figure to the $200,000 to $400,000 range, including by consulting an accountant whom counsel ultimately determined not to use at sentencing. (Dkt. 7-1 at 20 n.7 and Ex. F.)  Moreover, defense counsel successfully pointed out at sentencing that the stated figures were "possibly reduced by certain cash purchases for food by the ... deli." (Dkt. 7-2, Ex. D, at 10.)  Defense counsel did state at the sentencing hearing, however, that the level 14 loss figure was proper.  He said he had reviewed the available documentation with defendant, and had discussions with the government, and concluded as follows:

> [T]he cash expenditures, to a large extent, were without documentation.  They were based upon this defendant's practice with some vendors who had already gone out of business in making cash purchases for food, which, as I understand from Mr. Mills, is not uncommon ..., especially for a small grocery that does not have a substantial credit rating....  Notwithstanding that, ... given the documented figures by the Government and their calculations, it was determined that we could not change that figure with any degree of certainty.... and as a practical matter, ... while whatever reduction could have been documented is something to which the defendant is entitled, as a practical matter ..., given the guidelines and the reality of the ranges that invoke certain enhancements, namely $400,000 to one million, ... and where this defendant came up on the

16

> guidelines, that effort could not really be warranted
> past the point where we are at. So, I did discuss that
> with [the prosecutor], I did discuss it with the
> defendant, and I did tell [the prosecutor] that there
> were some cash transactions, but all in all, ... we
> could not document it or verify it past what I had
> discussed with [the prosecutor] and ... with the
> defendant. So, we are satisfied that the figures that
> are contained in the presentence report for the purpose
> of loss are acceptable, but they are not acceptable for
> the purpose of restitution, ... and I'll comment on
> that when the Court allows me to.

(Dkt. 7-2, Ex. D, at 11-12.)

The government points out that given its estimated loss figure of $978,488.87, the Court would have needed a basis to find that figure reduced by at least $578,488.87, in order for defendant's loss calculation to go below the $400,000 level and entitle him to any lower offense level. It argues that defense counsel was not deficient in acknowledging that a gap of that size could not be made up by arguing "cash purchases," and in focusing instead on defendant's successful effort to get the restitution figure significantly reduced. (Dkt. 7-1 at 21.) The government also denies that it committed any Brady violation in relation to the search warrant documents. (Id. at 13-19.)

The government principally argues, however, that Petitioner made a knowing and voluntary waiver of his rights when he pled guilty and when he agreed to waive his rights of direct appeal and collateral attack if the Court found his offense level within the stipulated figures. The government contends that considering the arguments of Petitioner and the records of the underlying

17

criminal case, the Court must conclude that Petitioner's waivers were knowing and voluntary and that upholding those waivers will create no miscarriage of justice.  (Id. at 8-12.)

*          *          *

We turn now to the analysis of the issues Petitioner raises in this motion.  The foregoing summary of relevant portions of the materials filed by the parties here and in the underlying criminal record is incorporated in this discussion.  Because Petitioner relies principally upon arguments of ineffective assistance of his former counsel at each step in his contentions in the Petition, we will start with the familiar Strickland rule.

### D.  The Strickland test

To succeed on an ineffective assistance of counsel claim, a petitioner must "show that counsel's performance was deficient." Strickland v. Washington, 466 U.S. 668, 687 (1984); see Gov't of V.I. v. Nicholas, 759 F.2d 1073, 1081 (3d Cir. 1985) (stating movant under 28 U.S.C. § 2255 must show counsel's representation was constitutionally inadequate).  Counsel's performance must be reasonable under prevailing professional norms, see Strickland, 466 U.S. at 688, whereas deficient performance consists of acts or omissions that are "outside the wide range of professionally competent assistance."  Id. at 690.  The Court must presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

18

See id. at 689; see also Buehl v. Vaughn, 166 F.3d 163, 169 (3d
Cir. 1999); Berryman v. Morton, 100 F.3d 1089, 1094 (3d Cir.
1996); United States v. Gray, 878 F.2d 702, 710 (3d Cir. 1989).
Furthermore, the Court must evaluate the objective reasonableness
of counsel's performance "from counsel's perspective at the time
of the alleged error and in light of all the circumstances, and
the standard of review is highly deferential." Kimmelman v.
Morrison, 477 U.S. 365, 381 (1986).

Petitioner must also "show that the deficient performance
prejudiced the defense." Strickland, 466 U.S. at 687.  A
petitioner has been prejudiced in an underlying criminal
proceeding if there is "a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding
would have been different." Id. at 694.  A reasonable
probability is a "probability sufficient to undermine confidence
in the outcome." Id.

If a petitioner fails to satisfy either part of the
Strickland test, a court must reject the ineffective assistance
of counsel claims, as:

> there is no reason for a court deciding an ineffective
> assistance claim to approach the inquiry in the same
> order or even to address both components of the inquiry
> if the defendant makes an insufficient showing on one. .
> . . If it is easier to dispose of an ineffectiveness
> claim on the ground of lack of sufficient prejudice,
> which we expect will often be so, that course should be
> followed.

Id. at 697.

### E.  Validity of the Guilty Plea

Petitioner seeks to challenge both his guilty plea and his waiver of rights to appeal and file a collateral attack of his conviction and sentence.  We will address the validity of the guilty plea separately from the appeal waiver.  Although the tests overlap, they are not identical and in the context of this case it is appropriate to evaluate the guilty plea itself at the outset.

The established test for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant."  North Carolina v. Alford, 400 U.S. 25, 31 (1970).  Where a defendant is represented by counsel and enters a guilty plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice "'was within the range of competence demanded of attorneys in criminal cases.'"  Hill v. Lockhart, 474 U.S. 52, 56 (1985) (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)).

Hill v. Lockhart holds that a claim of ineffective assistance of counsel in the context of a guilty plea is subject to the same standard of attorney competence set forth in the first prong of the Strickland test.  474 U.S. at 58-59.  However, the Hill Court specifically held that where the collateral challenge is to a plea of guilty rather than a trial verdict, the "prejudice" prong requires the petitioner to "show that there is

20

a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id.; see Parry v. Rosemeyer, 64 F.3d 110, 118 (3d Cir. 1995) (citing Hill). In setting forth that standard, the Court in Hill emphasized the "fundamental interest in the finality of guilty pleas." Hill, 474 U.S. at 58 (citing United States v. Timmreck, 441 U.S. 780, 784 (1979)).

The Petition on its face fails to state a claim under the Hill test, because it is devoid of any assertion that but for the alleged errors of counsel, Petitioner would not have pled guilty and would have insisted on going to trial. See Hill, 474 U.S. at 60 ("Because petitioner in this case failed to allege the kind of 'prejudice' necessary to satisfy the second half of the Strickland v. Washington test [in challenging a guilty plea], the District Court did not err in declining to hold a hearing on [his] ineffective assistance of counsel claim.").

The most that Petitioner, represented now by newly retained counsel, can say about his decision to plead guilty while represented by prior counsel, is that "prior to December 6, 2007, Mills was unaware of all of the documentary evidence the government possessed which could have impacted his guilty plea and subsequent sentencing." (Dkt. 10 at 4 (emphasis added).) Stated otherwise, and even less definitively, he contends:

> More likely, the evidence which was not considered by
> Chazen, the Assistant United States Attorney and Court

> coupled with expert testimony would could [sic] have
> further reduced the total offense level either
> resulting in a non-custodial sentence or quite
> <u>possibly</u>, a trial on the merits if the down side was
> not such a significant exposure.

(Dkt. 1-1 at 19 (emphasis added).)  This mere tentative musing
that having the search warrant receipts "could," "possibly" have
prompted him to proceed to trial on the merits does not meet the
<u>Hill</u> test on its face.  Nor does Petitioner explain how those
receipts, which he assuredly now has reviewed with his current
counsel, would likely have changed his sentencing prospects as he
contemplated whether to enter a guilty plea.

Assuming <u>arguendo</u> that Petitioner's asserted position has
surmounted the <u>Hill</u> threshold, however, and giving Petitioner the
benefit of every doubt and inference, we hold that as a matter of
law his claim of ineffective assistance of counsel in his
decision to enter a guilty plea is without merit.  The record
shows that Petitioner was not prejudiced by counsel's alleged
actions, thus failing the second prong of the <u>Strickland</u> test.

The government in this case had substantial evidence of
Petitioner's guilt, of which he and his then-counsel were well
aware when he pled guilty on the charge contained in the
Information.  The Petitioner's arrest was based upon a months-
long criminal investigation that was thoroughly documented in the
Search Warrant Application attached to the Criminal Complaint.
(Dkt. 1-2, Ex. A and Ex. B, at 4-8.)  The investigation included

surveillance; undercover cooperating witness cash transactions with Petitioner, using EBT cards inside the deli; observations of scant grocery stock or food purchases at the deli; and comparison with similar markets with markedly lower EBT transaction volume. (Id.)  The Petitioner's post-arrest voluntary confession placed him squarely in criminal conduct that he himself estimated at approximately $480,000 for just a 12-month period within the Information time frame (the Information, we have seen, covered almost 3 years).  See pp. 12-13, supra.[9]  His assertion that he might have proceeded to trial if he thought he faced a lower sentence estimate does not meet the Hill standard on this state of undisputed facts.

It is, of course, recognized that when a defendant considers the government's offer of a plea agreement, a reasonably competent attorney will attempt to learn all of the facts of the case and to make an estimate of a likely sentence.  See Hill, 474 U.S. at 56-60 (relying on McMann v. Richardson, 397 U.S. 759, 769-71 (1970)).  Before the attorney allows the client to plead guilty, the attorney must also communicate the results of that analysis.  McMann, 397 U.S. at 769-71.  Although the attorney's analysis need not provide a precisely accurate prediction of the

---

[9]  The plea that his counsel negotiated on his behalf avoided approximately three additional years of potential criminal exposure, because the Information covered only 2004-2006 and it protected him from prosecution going back to 2001.  (Dkt. 1-1, Ex. E, at 1, and Ex. F.)

respective consequences of pleading guilty or of going to trial,
the scrutiny must be undertaken in good faith.  Id.  It is
deficient performance for an attorney to fail to provide
good-faith advice about the sentencing consequences of a guilty
plea.  Id. at 769-71.

But the established general rule also is that where an
adequate guilty plea hearing has been conducted, an erroneous
prediction or assurance by defense counsel regarding the likely
sentence does not constitute grounds for invalidating a guilty
plea on grounds of ineffective assistance of counsel.  See United
States v. Shedrick, 493 F.3d 292, 298-300 (3d Cir. 2007) ("[A]n
erroneous sentencing prediction by counsel is not ineffective
assistance of counsel where, as here, an adequate plea hearing
was conducted."); United States v. Jones, 336 F.3d 245, 254 (3d
Cir. 2003); United States v. Mustafa, 238 F.3d 485, 492 (3d Cir.
2001); Masciola v. United States, 469 F.2d 1057, 1059 (3d Cir.
1972); see also United States v. Marzgliano, 588 F.2d 395, 399
n.6 (3d Cir. 1978) (explaining different rule where allegation is
that plea was based on misconduct or misrepresentation by defense
counsel); United States v. Valenclano, 495 F.2d 585, 588 (3d Cir.
1974) (same).

As the Third Circuit stated in Mustafa:

[w]e recognize that the maximum sentence authorized by
law is often so extraordinarily long that few
defendants other than "career criminals" plead guilty
with the expectation that the maximum sentence applies

24

> to them.  However, all that the law requires is that
> the defendant be informed of his/her exposure in
> pleading guilty.  The law does not require that a
> defendant be given a reasonably accurate "best guess"
> as to what his/her actual sentence will be; nor could
> it, given the vagaries and variables of each
> defendant's circumstances and offending behavior.

238 F.3d at 492 n.5.

We find these principles to be controlling on this issue.

Even assuming arguendo that had Petitioner's counsel obtained and

reviewed the search warrant receipts he might have predicted a

lower sentence before advising his client regarding a potential

guilty plea, that contention is unavailing under the prejudice

prong of the Strickland test as to the validity of the plea.

Here, the written plea agreement and a thorough Rule 11 in-

court guilty plea colloquy established Petitioner's maximum

potential exposure and the sentencing court's discretion.  His

written, signed plea agreement stated that (1) he faced a maximum

potential sentence of ten years incarceration, (2) he had reached

certain factual stipulations that were not binding on the court;

(3) the District Court retained ultimate discretion over the

sentence, up to and including the statutory maximum; and (4) there

were no other agreements or promises regarding his potential

sentence.  (Dkt. 1-2, Ex. E.)  He signed an accompanying Rule 11

Application form containing that basic information and much

additional information about the sentencing process.  (Dkt. 7-2,

Ex. E.)

25

Petitioner testified under oath at his Rule 11 hearing that he was aware that his statutory maximum was 10 years imprisonment and that under the plea agreement he made a limited waiver of the right to appeal, only as to the stipulated facts if the Court agreed with those stipulations.  (Dkt. 7-2, Ex. C, at 10-20.)  He expressly acknowledged that he had stipulated to either a total offense level of 15 or of 17 (based on a loss amount anywhere between $200,000 and $1,000,000), and that a sentence based on either resulting guideline range would be reasonable and he would not contest such a sentence.  He acknowledged his waiver of appeal and collateral attack rights (quoted <u>infra</u>).  (<u>Id.</u> at 16-20.)  He stated that he knew and understood that if the sentence turned out to be more severe than he was expecting, he would not likely be successful in trying to withdraw his guilty plea and would have to rely on the appeal rights retained after his limited waiver of appeal/collateral attack.  (<u>Id.</u> at 25-26.)  He assured the Court that he was fully satisfied with the advice and representation of his defense counsel at that stage in the case.  (<u>Id.</u> at 21.)

Petitioner testified to all of those facts in an attempt to convince the court to accept his plea.  He then testified under oath to the factual basis for his guilty plea.  Therefore, he may not now deny those very same facts.  <u>See United States v. Dickler</u>, 64 F.3d 818, 823 & n.7 (3d Cir. 1995) ("[W]hen a defendant under oath expressly admits facts at a plea hearing in

the course of persuading the court to accept his plea, he may not thereafter deny those facts any more than he may thereafter deny the facts alleged in the indictment and admitted by his plea.").

### F. Validity of the Waiver of Appeal/Collateral Attack

It is well settled that a defendant may validly waive his right to appeal or otherwise collaterally attack his conviction and sentence. Shedrick, 493 F.3d at 297; Khattack, 273 F.3d at 560-62. Courts honor such waivers unless either the defendant did not knowingly and voluntarily agree to the waiver, or the waiver would work a miscarriage of justice. Khattack, 273 at 562. "[B]y waiving the right to appeal, a defendant necessarily waives the opportunity to challenge the sentence imposed, regardless of the merits." (Id. at 561.)

Petitioner contends that ineffective assistance of counsel caused him to incur a more severe sentence than he should have received, and then caused him to fail to file a direct appeal of his conviction and sentence. Petitioner claims that those deprivations of effective counsel entitled him to relief under Section 2255. We will assume arguendo that prior counsel did fail to file a direct appeal although Petitioner indicated a desire to file. We will review the contentions regarding the severity of the sentence based upon the record here and in the underlying criminal case.

Our Court of Appeals has recently addressed the precise issue of what test to apply where it is claimed in a Section 2255

27

petition that counsel failed to file a direct appeal after
defendant had waived the appeal rights in question.  In <u>United
States v. Mabry</u>, 536 F.3d 231 (3d Cir. 2008), a Section 2255
petitioner complained that his counsel had failed to file an
appeal notwithstanding his request that counsel do so.  The court
rejected his reliance on <u>Roe v. Flores-Ortega</u>, 528 U.S. 470
(2000) (a case that did not involve an appeal waiver), and some
of its progeny in other circuits to the effect that in such
situation prejudice must be presumed.  Rather, it held that the
general rule of evaluating the validity of waivers of
appeal/collateral challenge rights applies.  It ruled that:

> While a defendant may be entitled to habeas relief if
> his attorney ineffectively fails to file a requested
> appeal because it is presumed to be prejudicial under
> <u>Flores-Ortega</u>, if that same defendant has effectively
> waived his right to habeas, he cannot even bring such a
> claim unless the waiver fails to pass muster under an
> entirely different test:  one that examines its knowing
> and voluntary nature and asks whether its enforcement
> would work a miscarriage of justice.
> ....
> We will consider the validity of the collateral waiver
> as a threshold issue and employ an analysis consistent
> with other waiver cases.

<u>Id.</u> at 241-42.  Applying that general test to the record in
<u>Mabry</u>, the Court of Appeals engaged in the independent review it
expected of a district court.  It concluded that petitioner's
waiver of appeal and collateral attack rights was knowing and
voluntary, and that enforcing the waiver would not result in a
miscarriage of justice.  <u>Id.</u> at 237-39, 242-44.  We reach the
same conclusion on the record presented here.

28

"[A] district court has an independent obligation to conduct an evaluation of the validity of a collateral waiver." Mabry, 536 F.3d at 238.  The court must specifically examine: (1) the knowing and voluntary nature of the waiver, based on what occurred and what defendant contends, and (2) whether enforcement would work a miscarriage of justice.  Id. at 238.

The Mabry court stated as to the knowing and voluntary aspect of its analysis as follows:

> The written plea agreement here clearly provides that the waiver is very broad, admits of no exceptions, and applies to both direct appeal and collateral challenge rights.  Counsel explained the waiver to Mabry and Mabry signed it, acknowledging that he understood the terms of the agreement.
>
> The colloquy similarly countermands any suggestion that the waiver was not knowing and voluntary.  Having scrutinized the colloquy as we are required to do when reviewing the enforcement of a waiver, we are satisfied that the district court 'inform[ed] the defendant of, and determine[d] that the defendant underst[ood] ... the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence' as Federal Rule of Criminal Procedure 11(b)(1)(N) requires.  Before the court accepted the plea agreement, it assured itself that Mabry had not been coerced or misled in any way into entering into the agreement.  The court explained the waiver at some length, Mabry responded directly to the court's questions, the prosecution reviewed the waiver with the defendant in open court, and defense counsel was permitted to explain further.
> ....
> Indeed, the colloquy amply demonstrates that the District Court took care to apprise Mabry of the consequences of the waiver and ensure that he understood the terms of the plea agreement and entered into it willingly.  Accordingly, we conclude that the waiver was knowing and voluntary.

Id. at 238-39.

29

The Rule 11 plea hearing here similarly covered all the topics described by the Mabry court, both in the review of the written documents agreeing to and explaining the waiver, and in the direct colloquy on the record between district court and defendant.  The written plea agreement and the accompanying Rule 11 application, which were both read, discussed and signed by Petitioner and his counsel, are in the record.  (Dkt. 7-2, Ex. B and Ex. E.)

Petitioner was personally addressed at considerable length by the Court during the Rule 11 plea hearing, including but not limited to the following colloquy:

Court:     And these stipulations are binding on you and binding
           on the Government, so you are entering into this
           agreement saying that I agree to abide by each of these
           points.  Understood?

Def:       Yes, ma'am.
....
Court:     So let us look at this now.  Paragraph 1, Schedule A,
           Page 6, it says what you and I have just been
           discussing.  It says you recognize that the sentencing
           guidelines are not binding on the Court.  Nevertheless,
           you and the Government agree to these stipulated points
           written down in this agreement and you and the
           Government agree that if the Court sentences you within
           the guideline range that results from the total
           guidelines offense level set forth below, that sentence
           will be acceptable to you and you will not argue for a
           sentence lower than the agreed total guidelines offense
           level would get you.  Do you see that?

Def:       Yes.

Court:     Is that your understanding as well?

Def:       Yes.
....
Court:     Now, in Paragraph 3, you talk about the loss level.
           Now, under the guidelines if we have an offense that
           involves some financial loss, either actual or intended,
           then part of determining the total offense level factors

in, well, ... how big of a financial crime was this,
and here you are saying that you are agreeing that the
loss incurred in the course of this offense conduct –
you are agreeing that it was greater than $200,000, and
the Government is agreeing that the total loss did not
exceed $1 million.  Is that your understanding?

Def:     Yes.

Court:   Okay.  Now within that broad range of between $200,000
and just under one million, the offense level
calculation would add either 12 or 14 points, depending
where in that range of 200,000 to one million the Court
decides the loss falls.  Understood?

Def:     Yes.

Court:   And you're agreeing that the Court can make that
decision and you will accept either a 12 ... or 14
level....  Understood?

Def:     Yes.
....
Court:   Paragraph 6 totals up all the numbers that we have been
looking at in the prior paragraphs, and it says that
your total offense level will be either 15 or 17,
depending on what the loss amount is that the Court
finds within that range of $200,000 to one million.  Is
that your understanding?

Def:     Yes.

Court:   Now, in Paragraph 7, it says that you and the
Government agree that a sentence within the guideline
range resulting from a total guidelines offense level
of 15 or even 17 will be reasonable, and you're not
going to contest or protest or object if the Court
finds even as high as a Level 17 total offense level.
Is that your understanding?

Def:     Yes.

Court:   Okay.  Then in Paragraph 8 and 9 we talk about the
right to appeal, and let me explain that very briefly.
In our court, even if you plead guilty you can attack
the sentence if you think there is something legally or
factually incorrect about the way the sentence comes
out.  Understood?

Def:     Yes.

Court:   So you have a right to appeal the sentence even if you
plead guilty.  Now, in this Paragraph 8, you are
agreeing with the Government that if the Court finds a

31

total offense level as high as 17, but no higher, then
if the Court sentences you within the guideline range
resulting from an offense level of 17, and no higher,
then you will not appeal that aspect of the sentencing
decision.

Def:      Yes.

Court:    Is that understood?

Def:      Yes, ma'am.

Court:    Okay.  Now, you can appeal other aspects of the
          sentencing decision, such as if the Court finds some
          kind of criminal history that you disagree with, but if
          the Court finds total offense level of 17 or less, and
          sentences you within the resulting guideline range
          based on that total offense level, then you wouldn't be
          in a position to appeal that because you're agreeing to
          waive your right to appeal as to that calculation.  Is
          that your understanding?

Def:      Yes, ma'am.

Court:    Now, when we say "appeal," this waiver of your right to
          appeal also extends to waiving any right to attack the
          sentence later, after appeal, using a petition or a
          motion that might otherwise be available to you, such
          as the type of thing that you would call a post-
          conviction petition or habeas petition.  Understood?

Def:      Yes.
...
Court:    All right.  Have I accurately summarized your plea
          agreement as you understand it?

Def:      Yes, ma'am.

Court:    Has anybody made you any promises that are different
          from or better than what you read on the page in this
          agreement?

Def:      No.

Court:    Has anybody tried in any way to force you to plead
          guilty or to enter into this plea agreement?

Def:      No, ma'am.

Court:    Are you fully satisfied with the advice and
          representation that Mr. Chazen, as your attorney, is
          providing to you in this matter?

Def:      Yes.

(Dkt. 7-2, Ex. C, at 13-21.)

This Court concludes the waiver of rights to appeal and collaterally attack the conviction and sentence in this case was knowing and voluntary, based upon Petitioner's own written plea agreement, Rule 11 application statements, and responses during the plea colloquy and all the surrounding circumstances.[10]

We next address whether enforcing the waiver will work a miscarriage of justice in this case.  Here again, Khattak and its progeny in the Third Circuit provide the principles of decision. This test has been articulated as follows:

> In the waiver context, we have adopted a common sense approach in determining whether a miscarriage of justice would occur if the waiver were enforced.  In Khattak, 273 F.3d at 563, we endorsed the methodology of the Court of Appeals for the First Circuit, which suggested "the clarity of the error, its gravity, its character (e.g., whether it concerns a fact issue, a sentencing guideline, or a statutory maximum), the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result" as factors to consider before invalidating a waiver as involving a "miscarriage of justice."  United States v. Teeter, 257 F.3d 14, 25-26 (1st Cir. 2001).  At the same time, we have declined to identify a list of specific circumstances which would give rise to, or constitute, a miscarriage of justice.

Mabry, 536 F.3d at 242-43.

This Court has carefully considered the record in this case applying those factors, and we must conclude that enforcing the

_____

[10]   The Mabry court stated in a footnote that, "[i]f Mabry were asserting that he was misled in some way, we might remand for a hearing."  536 F.3d at 238 n.7.  This Court does not interpret that guidance as applying where, as here, the Petitioner does not claim that his attorney misled him as to his waiver of appeal/collateral attack rights or any of the other terms of the plea agreement.

waiver here will not work a miscarriage of justice.  There are no non-frivolous issues that Petitioner could raise on a direct appeal.  His sentence was imposed in full conformity with his factual stipulations, the evidence, and the controlling substantive and procedural law.

The only non-frivolous issue that could have been raised on appeal, indeed, would have been the government's objection to the calculation of the restitution figure, a highly favorable ruling to Petitioner upon which there was significant room for debate and no case law cited directly on point in this circuit.  If Petitioner had been able to appeal, despite his clear waiver of that right in these circumstances, that would have inevitably drawn a cross-appeal from the government and Petitioner's sentence could only have become worse if the government's position on restitution prevailed on appeal.  Therefore, any asserted failure of defense counsel to file a direct appeal did not constitute ineffective assistance of counsel such as to create a miscarriage of justice overcoming Petitioner's waiver of appeal rights.[11]

We turn then to Petitioner's chief complaint, the assertion that prior counsel was ineffective at sentencing for failing to obtain and analyze the receipts and invoices collected in the

---

[11]   Here we reiterate an observation made earlier, that Petitioner still had time to seek an extension of time to file a direct appeal when he retained present counsel.  He did not pursue that remedy.  See n.3, supra.

search warrant execution, and did not seek to introduce expert testimony about typical patterns of cash expenditures at small deli businesses.  We cannot conclude that this demonstrates the type of prejudice that would support a claim of ineffective assistance of counsel sufficient to overcome Petitioner's clear and unambiguous waiver of appeal and collateral attack rights where, as here, the sentence that he received fell precisely within the stipulations that he made.

Petitioner himself, now aided by current counsel, has brought forth no analysis or even description of what those assorted search warrant receipts were, or how they could possibly have amounted to sufficient evidence, even under the preponderance of evidence standard applicable at sentencing, that the loss amount for guideline calculation purposes was less than $400,000. Petitioner offers no description or analysis of his receipts and invoices seized in the search warrant execution.  The government states that in preparing its response to the Petition it did attempt to decipher what they were, but found them to shed no light on issues of guilt or of determining a loss figure in this case.[12]  Nor can Petitioner convincingly argue that expert

---

[12]  The government describes the search warrant receipts as follows:

> The box in question contains a variety of receipts from food and non-food vendors, as well as unlabeled receipts, from between 2003 and 2005.  Through the benefits of the plea agreement, Mills was charged only

testimony such as he envisions would likely have persuaded a sentencing court to allow such hypothetical credits to Petitioner.  He himself estimated in his signed confession that the loss figures were well above $400,000 for only a portion of the offense conduct period.  (See pp. 12-13, supra.)

Petitioner's further arguments that counsel was ineffective for failing to move for downward departure at sentencing, or move for "reconsideration" after sentencing, are unavailing as well.

---

with conduct occurring between 2004 and 2006, and the loss figure was constrained to only the first few months of 2006.  Thus, many of the documents in the box – receipts from 2003 – are irrelevant to the charged crime.  Additionally, many of the receipts merely duplicate expenditures already credited in the government's loss calculation based on checks issued from the M&M Deli business account.
....
The documents do not even provide a basis for a more favorable estimate of loss than that already provided by the government.  The records contain receipts from some food vendors – purchases that might have later been resold to customers using food stamp benefits; however the records fail to provide material information to support a complete estimate of loss because: 1) many of the receipts document purchases from non-qualifying, non-food vendors such as Advanced Auto Parts, Brown & Williamson Tobacco Co., Crest Paper Products, Galaxy Music Distributors, Pep Boys Auto, The Times, The Trentonian, and U.S. Hair and Beauty, Inc. which are irrelevant to ... this case; 2) many of the receipts are blank (not identifying any vendor) and thus provide no information regarding food purchases for the deli; and 3) the receipts provide no information as to whether the purchased products were a) marketed at M&M Deli, b) actually sold during the time period in question, and c) sold to customers using food stamp benefits – all facts essential to a precise determination of the accurate loss.

(Dkt. 7-1 at 16-17.)

The plea agreement expressly waived any right to seek downward departure.  (Dkt. 1-2, Ex. E, at 7, ¶ 7.)  Nor has Petitioner identified any grounds upon which a guideline-based departure could have been granted.  There is no basis for a defendant to move for "reconsideration" of a sentence under the Federal Rules of Criminal Procedure, except under Fed.R.Crim.P. 35(a) (correcting a sentence that resulted from arithmetical, technical, or other clear error), and 36 (clerical error). Neither of those remedies would obtain the relief of resentencing that Petitioner seeks here.

Petitioner's argument that the government committed a <u>Brady</u> violation warranting relief is also devoid of merit.  Pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the government must disclose to the defense evidence that is material and exculpatory. <u>See</u> <u>Landano v. Rafferty</u>, 856 F.2d 569, 573 (3d Cir. 1988).  A violation of <u>Brady</u> occurs, however, only where the evidence in question is (1) suppressed by the government, (2) favorable to the defense, and (3) material to guilt or punishment.  <u>See</u> <u>United States v. Pelullo</u>, 399 F.3d 197, 209 (3d Cir. 2005).  Here, even if Petitioner had proceeded past the point of indictment (when the government's <u>Brady</u> obligations would have arisen), he has made no showing that the search warrant receipts would have been favorable to the defense or material to guilt or even to the guidelines sentencing calculations.

This Court concludes that the issues of alleged ineffective assistance of counsel that Petitioner seeks to raise in this collateral attack are insubstantial and encompassed by the waiver of appeal and collateral attack that he agreed to when he accepted a favorable plea agreement from the government.  Those issues implicate no fundamental rights or constitutional principles.  His Brady assertion also is unsupported by the record.  We conclude that this record does not reveal a violation of Petitioner's right to effective assistance of counsel, his due process rights as interpreted in Brady, or any other circumstances that would result in a miscarriage of justice if the Petition is denied.

This Court holds that Petitioner's waivers of jury trial, as well as the waivers of right to appeal or collaterally attack the sentence that he received, meet the two-prong test in that they (1) were knowing and voluntary, as the plea agreement was clear and the colloquy was sufficient and Petitioner has not indicated that he did not understand it, and (2) did not work a miscarriage of justice.  Thus we conclude that in this case, "[e]nforcing the waiver is in line with justice, not a miscarriage of it."  Mabry, 536 F.3d at 244.  Accordingly, this motion under 28 U.S.C. § 2255 to vacate, set aside or correct the sentence must be denied.

No certificate of appealability will issue pursuant to 28 U.S.C. § 2253(c).  Cf. Fed.R.App.P. 22; Loc.App.R. 22.2.  A certificate of appealability is issued "only if the applicant has

38

made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); <u>United States v. Cepero</u>, 224 F.3d 256, 267-68 (3d Cir. 2000).  For the reasons discussed above, the Petition does not make such a showing here.

The Court will issue an appropriate Order and Judgment.


                              s/ Mary L. Cooper
                         **MARY L. COOPER**
                         United States District Judge

Dated:  October 30, 2008